# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DYLAN HEATHERLY,** | : | |
| **Petitioner** | : | **No. 1:16-cr-00082-10** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| **Petitioner** | : | |

## MEMORANDUM

Petitioner Dylan Heatherly ("Petitioner") stands convicted of receipt or distribution of child pornography and conspiracy to do the same, 18 U.S.C. § 2252(a)(2), for which the Court sentenced him, in 2016, to an aggregate term of 300 months' imprisonment.  (Doc. No. 949.) Following an unsuccessful direct appeal, see United States v. Heatherly, 985 F.3d 254, 273 (3d Cir. 2021), Petitioner filed a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, which is currently pending before the Court.  (Doc. No. 1114.)  Petitioner argues that his attorney provided ineffective assistance at sentencing by failing to obtain and present mitigating evidence—including a forensic psychological evaluation—based on which the Court would have imposed a lower sentence.  (Id.)  Also before the Court is Petitioner's "Unopposed Motion for Leave to Amend," by which he seeks to supplement his § 2255 motion with additional "factual bases and legal arguments" and provide the report of a forensic psychologist. (Doc. No. 123.)  For the following reasons, the Court will grant Petitioner's Unopposed Motion for Leave to Amend and deny Petitioner's § 2255 motion.

## I.      BACKGROUND

### A.      Petitioner's Criminal Proceedings

In 2016, a grand jury returned an eighteen-count superseding indictment charging Petitioner and several codefendants with various child-pornography offenses.  (Doc. No. 143.)

Of the eighteen counts, four pertained to Petitioner.  Count 11 charged him with conspiracy to receive or distribute child pornography in violation of 18 U.S.C. § 2252(a)(2) and (b)(1).  (Id.) Count 12 charged him with receipt or distribution of child pornography in violation of 18 U.S.C. § 2252(a)(2).  (Id.)  Count 13 charged him with conspiracy to publish a notice and advertisement seeking to receive and distribute child pornography in violation of 18 U.S.C. § 2251(d).  (Id.) Count 17 charged him with knowingly publishing a notice and advertisement seeking to receive and distribute child pornography in violation of 18 U.S.C. § 2251(d).  (Id.)  Petitioner entered a plea of not guilty to all charges, and the Court appointed him counsel, Attorney Robert J. Daniels, Jr. ("Attorney Daniels"), who represented Petitioner throughout pretrial proceedings, during trial, at sentencing, and on direct appeal.  (Doc. Nos. 169, 181, 1114 at 10.)

In 2017, the Government offered Petitioner a plea agreement that called for him to plead guilty to the more serious of the charges against him—Counts 13 and 17 of the superseding indictment—in exchange for the Government's dismissal of Counts 11 and 12.  (Doc. Nos. 1114 at 17, 1127 at 5 n.2.)  Petitioner declined the offer but indicated a willingness to plead guilty to the inverse, i.e., guilty on Counts 11 and 12 in exchange for the dismissal of Counts 13 and 17. (Id.)  The Government declined to extend such an offer.  (Id.)  Petitioner proceeded to trial, with the one other codefendant who did not accept a plea offer, William Staples ("Staples"), and on January 25, 2018, the jury found Petitioner guilty of Counts 11 and 12, acquitted him of Count 13, and hung on Count 17.  (Doc. Nos. 848, 1127 at 4 n.1.)

The United States Probation Office ("Probation") subsequently prepared and filed a draft presentence report ("PSR") proposing an advisory guidelines range of 108 to 135 months' incarceration.  (Doc. No. 1114 at 18.)  Probation calculated a total offense level of 31, reflecting a base offense level of 22, a two-level decrease due to Petitioner's conduct being limited to

receiving (and not distributing) child pornography, and an eleven-level increase based on the fact that the materials Petitioner received involved a prepubescent minor, sadistic or masochistic conduct, use of a computer, and more than 150 but fewer than 300 images.  (Id.)  Probation assigned Petitioner a base offense level of 22 pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2G2.2(a)(1), which assigns a base offense level of 22 for offenses involving the receipt of child pornography.  The Government filed objections to the draft PSR (Doc. No. 930), and the Court scheduled Petitioner's sentencing hearing for June 6, 2019 (Doc. No. 927).

In April 2019, Probation submitted a final PSR.  (Doc. No. 1114 at 19.)  The final PSR assigned Petitioner a base offense level of 32, which, adjusted for enhancements, resulted in an advisory guidelines range of life imprisonment.  (Id.)  The range was capped, however, by a statutory maximum of 240 months on each of his convictions, i.e., 480 months' imprisonment.  (PSR ¶ 63.)  The increase of the base offense level from 22 (draft PSR) to 32 (final PSR) resulted from Probation's application of the "cross-reference" provided in U.S.S.G. § 2G2.2(c).  That provision directs the Court to apply a base offense level of 32, as provided in § 2G2.1(a), "[i]f the offense involved causing, . . . or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of . . . transmitting a live visual depiction of such conduct."  See id.  While the jury acquitted Petitioner of publishing a notice or advertisement, as the Third Circuit Court of Appeals noted in denying his appeal, his sentence "properly depended not only on [his] own conduct, but also on that of [his] coconspirators."  See Heatherly, 985 F.3d at 272.  One of his coconspirators produced a live visual depiction of child pornography, and the evidence showed that Petitioner "agreed with [that coconspirator] to have him live-stream child pornography."  See id.  For that reason, the final PSR presumed a base offense level of 32.

Probation also submitted a Sentencing Recommendation (Doc. No. 931) setting forth the

guidelines range of 480 months' imprisonment and recommending a sentence of 360 months' imprisonment.  Probation noted that Petitioner grew up in an unstable household that exposed him to verbal and mental abuse, that he believes he suffers from undiagnosed depression due to his father's untimely death, that he was participating in prison counseling, that he denied recent use of illicit drugs, and that he had no criminal record.  (Id.)

Attorney Daniels submitted a sentencing memorandum on June 3, 2019, asserting a guidelines range of 108 to 135 months or, with acceptance of responsibility, 87 to 108 months. (Doc. No. 1114-4.)   The memorandum included numerous character letters from friends, family, and supporters (a minister, doctor, and former professor among them), a prison counselor's letter confirming Petitioner's regular participation in counseling, and certificates Petitioner earned through various programming while in custody, e.g., classes in victim awareness and stress and anger management.  (Id.)  The memorandum also challenged the applicability of § 2G2.1(a) through § 2G2.2(c), which resulted in the increase in base offense level from 22 to 32, and advanced various other arguments in support of a more lenient sentence, noting Petitioner's positive work history, the tragic passing of his father when he was nine years old, his upbringing in the care of his aunt and uncle, and the fact that Petitioner was willing to plead guilty to the offenses of which the jury found him guilty.  (Id.)

At Petitioner's sentencing hearing, Attorney Daniels restated the contention in his sentencing memorandum that the Court should not apply §§ 2G2.1(a) and 2G2.2(c) and should instead assign a base offense level of 22 pursuant to § 2G2.2(a)(2).  (Doc. No. 958 at 9.)  From that base level, Attorney Daniels argued for a guidelines range of 87 to 108 months, which assumed Petitioner's entitlement to a level decrease for acceptance of responsibility.  (Id.) Advocating for a significant departure from the guidelines, Attorney Daniels called four

witnesses to testify about Petitioner's good character, argued that Petitioner's willingness to plead guilty to his crimes of conviction and a letter he submitted to the Court demonstrated an acceptance of responsibility, and highlighted Petitioner's lack of criminal history, the absence any evidence that Petitioner distributed child pornography, Petitioner's efforts at rehabilitation while in prison, and Petitioner's remorse and recognition of his wrongful conduct.  (Id.)

At the conclusion of the sentencing hearing, the Court imposed a sentence of 300 months' imprisonment in recognition of the entirety of the record, including potential sentencing disparities among Petitioner's numerous codefendants, concluding that such a sentence reflected the seriousness of Petitioner's offenses and would best serve the sentencing objectives of adequately punishing, promoting respect for the law, and deterring others from engaging in similar conduct.  (Doc. No. 958 at 41-42.)  The Court also imposed a 15-year term of supervised release.  (Id. at 43.)

**B.    Expert Report**

After he filed his § 2255 motion, Petitioner, aided by his § 2255 counsel, obtained the expert report ("Report") of Jennifer Weeks, Ph.D. (Doc. Nos. 1124-1, 1128 at 2.)  Petitioner then filed his "Unopposed Motion for Leave to Amend" (Doc. No. 1123), with a brief in support (Doc. No. 1125), seeking to supplement his petition with an amended § 2255 motion (Doc. No. 1124) based on the Report's findings.  As an initial matter, the Court will grant Petitioner's unopposed motion and has considered his amended motion (Doc. No. 1124) and its exhibits, including the Report (Doc. No. 1124-1).[1]  Dr. Weeks evaluated Petitioner on May 6, 2022, and

---

[1]  Federal Rule of Civil Procedure 15, which governs amended pleadings, applies to motions to amend § 2255 motions.  See United States v. Duffus, 174 F.3d 333, 336 (3d Cir. 1999) (stating that "[t]he Federal Rules of Civil Procedure apply to motions to amend habeas corpus motions").  "As such, generally a party may amend his habeas motion 'as a matter of course' prior to the Government's filing of a response," provided that, if amendment is sought after § 2255(f)'s one-

reviewed the underlying records in this case before submitting the Report, which is bears the title
"Adult Psychosexual Evaluation and Risk Assessment."  (Doc. No. 1124-1.)  The Report
consists of roughly two parts: (1) a description of Petitioner's statements about his background;
and (2) Dr. Weeks's conclusions and the studies upon which she based them.  Both are discussed
below.

### 1.    Petitioner's Background

The Report reflects Petitioner's statements about his childhood.  (Id. at 2.)  He reported
being afraid of his father, who was authoritative, "ruled with an iron fist and used a belt for
physical punishment," physically abused Petitioner's mother, "sold marijuana and guns in the
house," "hit his dogs and cats," and exhibit extreme bigotry and hatred toward "black and gay
people."  (Id. at 2-3.)  Petitioner reported his father's bout with melanoma, sickness for most of
Petitioner's life, and ultimate death in 1993.  (Id. at 3.)

Petitioner also described to Dr. Weeks the fact that he did not get along with the
boyfriend his mother took after his father's death, and that he and his mother had a falling out
when he was 18 years old.  (Id.)  The following incident involving his mother's boyfriend, John,
precipitated the falling out:

> John grabbed his mother by the back of the head and pushed her head into the
> bathtub to show her how dirty it was.  [Petitioner] stated he "came unglued."  He

---

year statute of limitations expires, "the amendment 'relates back' to the original motion under
[Rule 15(c)]."  See United States v. Kraeger, No. 3:11-cv-00084, 2017 WL 635115, at *1 (M.D.
Pa. Feb. 16, 2017) (citing United States v. Thomas, 221 F.3d 430, 436 (3d Cir. 2000)).  New
habeas claims "relate back if they arise from the 'same conduct, transaction, or occurrence'
described in a timely filed § 2255 motion."  See id. (quoting Mayle v. Felix, 545 U.S. 644, 664
(2005)).  As to § 2255 habeas claims, "[s]o long as the original and amended petitions state
claims that are tied to a common core of operative facts, relation back will be in order."  See
Mayle, 545 U.S. at 664.  As noted above, Petitioner's amended motion is unopposed and is
clearly "tied to a common core of operative facts" as his initial § 2255 motion.  Accordingly, the
Court will grant the motion and has considered the amended motion (Doc. No. 1124) in deciding
whether to grant Petitioner § 2255 relief.

> grabbed John and pulled him off his mother.  He and John had an altercation and
> [Petitioner] punched him.  John proceeded to punch him several times.  He stated
> he was kicked out of the house and did not talk to his mother for a year and a half.

(Doc. No. 3.)  Petitioner stated that, at school, following his father's death, he became

"disassociated," was forced to move to a different school when he and his mother moved in with

John, was "bullied and had no friends," and developed self-esteem issues and depression.  (Id.)

Those issues, along with anxiety, continued "throughout [Petitioner's] school career" and "were

never noticed by his family and therefore never addressed in therapy."  (Id. at 4.)  Although he

attended college for graphic design, Petitioner dropped out after having a falling out with his

family but continued to attend on-and-off until he began studying art full-time when he was 29

years old.  (Id.)

       In addition to Petitioner's family and childhood background, the Report contains

statements about his employment history, friendships and a two-and-a-half-year romantic

relationship with a man he met online, and medical and mental health treatment.  (Id. at 4.)  As to

mental health treatment, Petitioner informed Dr. Weeks that "he had some therapy in school

when his father died" and saw a prison counselor while awaiting trial.  (Id.)  Petitioner's

"significant issues with depression, grief and self-esteem in childhood" were never "addressed

with an outside therapist," and "[h]is mother stated that she did not know that he was having

these issues and she trusted the school to take care of it."  (Id.)  He first had "any real therapy

experience" while incarcerated, and the prison psychiatrist has recommended medication.  (Id. at

4-5. )  Petitioner reported a history of suicidal ideation and indicated that he "had plans to kill

himself before he was arrested."  (Id. at 5.)  "[Petitioner] had descended into a hole of depression

that he was self-medicating with pornography use.  He was going to hang himself.  He did not

actually attempt this.  He denies any active suicidal ideation."  (Id.)

Another section of the Report that is particularly relevant to Petitioner's motion concerns his history of substance abuse.  (<u>Id.</u>)  The Report indicates that Petitioner drank alcohol on weekends throughout high school and continued to do so until he began using cocaine in is early 20s, at which point his alcohol consumption increased.  (<u>Id.</u>)  Petitioner started smoking marijuana when he was 13 years and later used the drug more heavily "to self-medicate the depression and isolation he was experiencing in school that stemmed from the move, not fitting in, and being frequently bullied by the other students."  (<u>Id.</u>)  He cut back on smoking marijuana after he became paranoid at the age of 21, and he smoked on an off for the five to six years preceding his indictment in this case.  (<u>Id.</u>)  When he began using cocaine at the age of 22, Petitioner took to the drug "and called it his kryptonite."  (<u>Id.</u>)  He continued using cocaine on and off but later stopped "cold turkey."  (<u>Id.</u>)  Petitioner also used MDMA, mushrooms, and, on one occasion, acid.  (<u>Id.</u>)

Finally, the Report touches upon Petitioner's sexual history and history of sexual abuse. Because those aspects of the Report are relevant to Petitioner's motion, the Court quotes them verbatim below.

<u>Sexual History</u>: Mr. Heatherly reported that he first had consensual sexual intercourse at the age of 19 years old with an age-appropriate partner.  The man was named Oscar.  Oscar was straight at the time but later came out as gay.  This was oral sex but not penetrative.  He was 23 years old when he first engaged in any type of penetrative sex.

Mr. Heatherly does not recall how he learned about sex but feels like he always had an innate understanding of it.  Dylan recalls having a crush on Doogie Houser when he was 4 or 5 years old.

Mr. Heatherly stated that he does not recall at what age he was exposed to internet pornography.  When he was younger, he frequently looked at it as he had a computer in his room.  His mother's boyfriend was into technology.  The computer in his room had a webcam and he would chat with people.  He reports that as an adult his pornography use was limited until he was around 29 years old.  He was actively engaging with others until then.  From 29 to 31/32 his pornography use

escalated.

Mr. Heatherly stated that he would go on sites like xtube, xhamster, silverdaddies and adam4adam.  He stated that he preferred older men.  He liked to see videos of older men with men in their 20s or 30s.  He was attracted to the difference in age with an older man.

Mr. Heatherly stated he has never created his own pornography.  He has read erotic stories.  He stated that, when his use was problematic, he would try to stop.  About three times he deleted everything including contacts, logins and email.  He could go for about a month and then would go back to it.

Mr. Heatherly stated that he figured out what masturbation was on his own.  He recalls that he would rub himself on the floor because it felt good, and he would also make a blanket or pillow fort to rub on while Doogie Houser was on.  He reports that when he was younger, he would masturbate up to a few times a day.  This decreased as he got older and became sexually active.  As an adult, he would only masturbate if he was not sexually active.  Mr. Heatherly stated that when he was living alone in San Diego, he was lonely and was masturbating all the time.  He basically watched TV, slept, ate[,] watched pornography, and masturbated up to three times a day.  He denies ever masturbating in public, in a car or while driving.

Mr. Heatherly stated that he used to chat online when he was younger.  As he got older this moved into chatting with people on apps.  He did sex chat.  He has also used a webcam for sexual purposes.  Mr. Heatherly stated that he has taken sexual images of himself and sent them to others.  He has also received these images.  Mr. Heatherly stated that he has been solicited on apps like Grindr by minors.  When he found out their age, he would stop communicating with them.

Mr. Heatherly denies ever going to a massage parlor, exchanging money for sex, or cheating in a monogamous relationship.  He has engaged in hook ups and been to adult bookstores.  He has had anonymous sex.  Prior to apps for hook ups, he would go cruising in bathrooms known for that activity.  Mr. Heatherly has not exposed himself.

Mr. Heatherly has engaged in some voyeurism in his past.  He stated that when he was in high school, he could see his neighbor's bedroom from his room.  He would watch his male neighbor masturbate and have sex with his girlfriend.  He also would watch pornography of hidden video cameras though he denies engaging in this himself.

Mr. Heatherly has never cross dressed.  He acknowledged a fetish for black ankle socks.  He stated he likes the ankle cleavage.  He denies ever engaging in bestiality.

Mr. Heatherly stated that while he has been incarcerated, he was accused by another

inmate of drawing illegal pornography.  This was determined to be an unfounded allegation.  He did not draw any pornography.  He was concerned that this was still on his record though it was found not to be true.  It is not uncommon for inmates who are incarcerated for sexual crimes, particularly those against a minor, to be targeted by other inmates.

<u>Sexual Abuse History</u>: Mr. Heatherly denies any concrete memories of sexual abuse.  However, he does have several memories that cause him discomfort.  One memory involves him being young and sitting on the toilet.  He is being yelled at. He feels upset and feels someone's hand is in his anus.  The second memory is something that happened somewhere not at home.  He recalls being in an adult bed. He recalls being yelled at, being upset, and being told to go lay on the bed.  He recalls looking out a window and being touched under blankets.

At this point, it is unclear as to whether there is a clear link between Mr. Heatherly's traumatic sexual experiences [and] . . . his compulsive pornography use as an adult. As it is commonly accepted that childhood sexual abuse can cause a myriad of mental health issues in adults, this is something that Mr. Heatherly should explore further in therapy.

(<u>Id.</u> at 6-7.)

Petitioner further "reported . . . child pornography from the age of 29 to 32, adult internet pornography from the age of 14 to 32, [and] adult pornography from the age of 14 to 32," and "[h]e also acknowledged that he engaged in obscene notes/emails/calls from the age of 14 to 32, voyeurism 8 times from the age of 11 to 29, and sex with strangers 150 times from the age of 20 to 32."  (<u>Id.</u> at 11.)  There are far too many statements in the Report to quote in full here, but the Court has considered them all in reaching its conclusions, <u>infra</u>.

## 2.   Dr. Weeks's Opinions

Dr. Weeks's testing of Petitioner resulted in the following findings, many of which are based on "self-report measure[s]": (1) "at some point, there was a high likelihood that Mr. Heatherly fit the definition of a sex addict"; (2) Petitioner had "an issue with hypersexuality at the time prior to the investigation"; (3) "he finds the idea of having sex with an adult man very arousing"; (4) "he was an average online user"; (5) he experiences "moderate depression" and

"severe anxiety"; (6) he "has a high probability of having a substance use disorder"; (7) he experienced trauma when he was involved in a serious car accident at the age of 19, when he "witnessed a serious accident resulting in death when he was 21 years old," and when "[h]e was at work and saw an industrial truck run over a man on a bicycle whose head 'exploded'"; (8) he suffers from "major depressive disorder and addiction issues"; (9) he displayed a "highly problematic range" regarding "social desirability"; and (10) his "data revealed a sexual interest in males only."  (Id. at 9-12.)[2]

Based on a review of Petitioner's background, testing results and self-reports, and other information referenced in the Report, Dr. Weeks recommended a course of treatment, e.g., group and individual therapy and medication prescribed by a psychiatrist.  (Id. at 16-17.)  Dr. Weeks based those recommendations on various findings and conclusions, e.g.:

Static Risk Factors:

Age:  It has previously been reported (Hanson & Harris, 2001) that sexual recidivism  decreases with age.  As Mr. Heatherly is 38 years old, his age has limited protective effect on his likelihood of recidivism.

Long term adult relationships:  Research has indicated that being in a long-term adult relationship is a protective factor for recidivism.  The risk to re-offend is lower in men who have been able to form healthy relationships.  Mr. Heatherly has been in a long-term relationship and lived with a partner in the past.

Previous Criminal History:  Mr. Heatherly has no prior criminal history.

Substance abuse/use during the five years before the index sexual offense:  Prior substance use, and abuse can negatively influence recidivism.  Mr. Heatherly, he has a history of abusing cocaine, but this has not occurred in nearly a decade.

(Id. at 13) (citation omitted).  Dr. Weeks further explained that Petitioner "show[ed] no signs of internet addiction prior to his arrest," and that his "compulsive use of pornography and

---

[2] One of these findings refers to a "Mr. Bragg," whom Dr. Weeks "g[ave] [a] questionnaire about childhood experiences."  (Doc. No. 1124-1 at 10.)  The reference is presumably inadvertent.

masturbation were his means of coping with his negative affective states." (Id.)

The Report also reflects Dr. Weeks's discussion of research suggesting that "internet only child pornography offenders" do not pose the same risk of recidivism as do "contact" or "mixed" offenders. As Dr. Weeks explains, "Internet Only Offenders have not engaged in any contact sexual offending, their only sexual offense is that of interacting with (viewing, downloading, sharing, etc.) child pornography online," whereas "Mixed Offenders are those offenders who have both been engaged with child pornography online and have a contact offense." (Id.) According to Dr. Weeks, Internet Only Offenders are: (1) "more likely to have sexual interest in children and higher levels of deficits in interpersonal functioning"; (2) "less likely to have offense supportive beliefs and less distorted thinking about offending than contact offenders"; (3) more empathetic to victims, with "lower levels of emotional identification with children"; and (4) not "inevitably" compelled "to direct contact offending against children." (Id. at 13-14.)

Dr. Weeks concluded that Petitioner "appears to fall into the Internet Only Offender category," as his "clinical profile fits with this offender typology"—that is, he "experiences depression and anxiety as well as some isolation," and he "denie[d] any sexual contact with a minor," although his denial of such conduct was "not [] confirmed with a sex history polygraph." (Id. at 14.) Citing studies and statistics suggesting that the risk of recidivism among Internet-only offenders is lower than for "contact" sexual offenders, Dr. Weeks opined as follows:

> Risk to Sexually Re-offend:  Mr. Heatherly is a low risk to re-offend.  Based on what is known about child pornography offenders from the research, Internet Only Offenders have a very low recidivism rate.
>
> Risk Factors:  Based on initial assessment and a review of Mr. Heatherly's records, his primary risk factor for online re-offending is his historic use of pornography and masturbation as a means of emotion regulation.  This risk factor that [sic] can be addressed in treatment.  Mr. Heatherly has expressed a strong desire to attend therapy to address these issues.

<u>Needs</u>:  Mr. Heatherly has some specific treatment needs in addition to sex offender specific treatment.   These include sexual compulsivity, childhood trauma, depression, and anxiety.

<u>Responsivity</u>: As Mr. Heatherly has no known learning differences, he does not appear to have any specific responsivity needs.

(<u>Id.</u>)  Related to these conclusions, Dr. Weeks stated that aspects of Petitioner's experience (<u>e.g.</u>, loss of his father and sexualized grief) manifested as a "prefer[ence] for decades older men or 'daddies' as well as his identification with the child in the images of child sexual abuse that he viewed."  (<u>Id.</u> at 15.)

Following Petitioner's filing of his "Unopposed Motion for Leave to Amend" (Doc. No. 1123), amended § 2255 motion (Doc. No. 1124), and brief in support (Doc. No. 1125), the Government filed a brief in opposition (Doc. No. 1127) to Petitioner's initial § 2255 motion (Doc. No. 1114).  Petitioner then filed a reply brief in support of his motion (Doc. No. 1128), making his § 2255 motion ripe for disposition.

## II.    LEGAL STANDARD

Under 28 U.S.C. § 2255(a), a federal prisoner may file a motion requesting that the sentencing court vacate, set aside, or correct his sentence on the basis "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the [C]ourt was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  <u>See</u> 28 U.S.C. § 2255(a).  However, § 2255 does not afford a remedy for all errors that may have been made at trial or during sentencing.  <u>See</u> <u>United States v. Essig</u>, 10 F.3d 968, 977 n.25 (3d Cir. 1993) (citing <u>United States v. Addonizio</u>, 442 U.S. 178, 185 (1979)).  Rather, § 2255 is implicated only when the alleged error raises "a fundamental defect which inherently results in a complete miscarriage of justice."  <u>See</u> <u>Addonizio</u>, 442 U.S. at 185.

Claims of ineffective assistance of counsel are governed by a two-part test established by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984). See George v. Sively, 254 F.3d 438, 443 (3d Cir. 2001). The first Strickland prong requires Petitioner to "establish first that counsel's performance was deficient." See Jermyn v. Horn, 266 F.3d 257, 282 (3d Cir. 2001). This prong requires Petitioner to show that counsel made errors "so serious" that counsel was not functioning as guaranteed under the Sixth Amendment. See id. Under the second Strickland prong, Petitioner "must demonstrate that he was prejudiced by counsel's errors." See id. This prong requires Petitioner to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." See Strickland, 466 U.S. at 694. Reasonable probability means "a probability sufficient to undermine confidence in the outcome." See id.

## III.    DISCUSSION

Petitioner argues that Attorney Daniels provided ineffective assistance by failing "to adequately investigate and then present important mitigating evidence" leading up to and during the sentencing hearing. (Doc. No. 1114 at 44.) Petitioner states:

> [Attorney Daniels] did not enlist the services of a mental health professional to conduct a psychological evaluation of [Petitioner] or to testify at his hearing. No risk assessment was conducted or introduced, establishing that [Petitioner] poses a minimal risk of reoffending. No report was produced explaining [Petitioner's] background and salient characteristics. [Attorney Daniels] did not seek to explore [Petitioner]'s stated history of depression, suspected child abuse as a child, early abuse and trauma surrounding the loss of his father and his mother's abusive boyfriend, his adult drug dependency and issues around his sexuality.

(Id. at 44-45.) Noting that Attorney Daniels did not present expert evidence "regarding any causes of his criminal behavior or the risk that [Petitioner] personally poses to the community," Petitioner argues that "[a] simple social history – even absent an expert's report – would have revealed a history of trauma, childhood abuse, mental illness and substance abuse." (Id. at 46.)

14

According to petitioner, "unbeknownst to the Court, [he] has recall of sexual abuse as a child," and "[w]hile he self-reported depression, the Court gave only passing reference to that condition, even equivocating on whether it was factually present given the lack of any evaluation."  (Id.)

Having carefully considered Petitioner's motion, the parties' briefs in support of their respective positions and related exhibits, and the record as whole, the Court concludes that Petitioner has not established prejudice under the second Strickland prong and is therefore not entitled to relief under § 2255.  In this regard, courts "may consider the Strickland prongs in either order, and, indeed, [the Third Circuit has] noted that it is often practical to consider the prejudice prong first."  See United States v. Fazio, 795 F.3d 421, 426 (3d Cir. 2015) (citation omitted); see also United States v. Cross, 308 F.3d 308, 315 (3d Cir. 2002) (beginning Strickland analysis "with the prejudice prong" based on the preference for "avoid[ing] passing judgment on counsel's performance when possible").  Here, the Court will begin with the prejudice prong because, even assuming Attorney Daniels was ineffective for failing to investigate and present mitigating evidence, the evidence that Petitioner faults Attorney Daniels for not obtaining would not have affected the Court's sentencing determination.

When the Court sentenced Petitioner, it considered the factors set forth in 18 U.S.C. § 3553(a), e.g., the "nature and circumstances of the offense and the history and characteristics of the defendant," the "need for the sentence imposed,"[3] the "kinds of sentences available," and "the need to avoid unwarranted sentence disparities among defendants with similar records who

---

[3]  As to the "need for the sentence imposed," courts are to craft a sentence: (1) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; (2) "to afford adequate deterrence to criminal conduct" (3) "to protect the public from further crimes of the defendant"; and (4) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]" See 18 U.S.C. § 3553(a)(2)(A)-(D).

have been found guilty of similar conduct." See id. If the Court were to resentence Petitioner today and reevaluate the § 3553(a) factors in light of the Report and the information and circumstances referenced in Petitioner's motion papers, the Court would impose the same 300-month sentence. This is so for several reasons.

First, the conduct underlying Petitioner's offenses was abhorrent. He "frequented an internet chat room where users regularly shared child pornography." See Heatherly, 985 F.3d at 258. One of Petitioner's codefendants, William Chandler Augusta, was a "chat-room user" who "repeatedly live-streamed himself raping and sexually abusing his six-year-old nephew," and Petitioner "encouraged [Augusta] as he did so," while also "repeatedly ask[ing] users for other child-pornography videos . . . ." See id. On one occasion, Petitioner logged into the chat room "while users were sharing prerecorded child pornography" and commented, "so appreciate if someone showed vids—need to bust [that is, ejaculate] before work." See id. at 260. Less than a minute later, the victim's uncle "began streaming his live abuse" of the nephew, and shortly after that, Petitioner "posted a second public comment: 'so close here.'" See id. Forensic analysis of Petitioner's electronic devices revealed multiple child pornography images and a video. See id.

The seriousness of Petitioner's offenses cannot be understated and played a critical part in the Court's sentencing determination, militating in favor of imposing a sentence closer to the advisory guidelines range under the statutory cap. As the Court noted at sentencing, this is "a horrible case," a "nightmare for the victim" and "the [defendants'] families." (Doc. No. 958 at 41.) Had the Court been privy to the additional information referenced in Petitioner's motion papers and the Report, the Court would still be within its discretion—and would still decide—to impose 300 months of imprisonment despite the mitigating factors. See, e.g., United States v. Bungar, 478 F.3d 540, 546 (3d Cir. 2007) (stating that "a district court's failure to give

mitigating factors the weight a defendant contends they deserve [does not] render[] the sentence unreasonable").

Second, the Court and counsel took great pains to avoid creating sentencing disparities among the numerous defendants indicted in this case. (Doc. No. 958 at 40-41.) The Court carefully crafted Petitioner's 300-month, below-guidelines sentence relative to his conduct vis-à-vis his codefendants' sentences and the conduct underlying their convictions. (Id. at 41) (noting that, "based on what we know about this man's conduct, he is less culpable than some others who were in that [chat] room, and he needs to be treated as such"). Most codefendants (all but one, Staples) pleaded guilty and were sentenced at or above 300 months. (Doc. Nos. 929 at 2-3, 946 at 25.) As Petitioner notes, there were a few outliers. For example, the Court sentenced one codefendant, Ed Westbury, to 78 months' imprisonment; however, as the Court noted during the sentencing hearing, "[the Court] consider[s] Mr. Westbury an outlier, for want of a better term, because he pled guilty and his guideline range was calculated at 78 to 97 months based on a criminal history category one and an offense level 28." (Doc. No. 958 at 34.) The evidence that Petitioner argues Attorney Daniels failed to obtain would have had no bearing on the Court's assessment of sentencing disparities. Indeed, any lower sentence would have created—not eliminated—disparities given the conduct of each defendant.

Third, the presentencing record and the parties' arguments at sentencing informed the Court about the general nature of the various circumstances that Petitioner argues Attorney Daniels failed to explore and develop for potential use as mitigation evidence at sentencing. As the Government notes, "[t]he PSR spent 10 paragraphs detailing Petitioner's difficult relationship with his father and mother's boyfriend, his father's death, physical abuse, depression, and substance abuse as an adult." (Doc. No. 1127 at 14.) A transcript of Petitioner's interview of

law enforcement following his arrest, which was admitted as evidence during his trial, informed the Court about Petitioner's memories of childhood sexual abuse.  (Doc. No. 1114 at 29.)  The Court itself noted that Petitioner "perhaps [has] a history of depression," adding that Petitioner's background reflected "no prior criminal history, no drug history, perhaps a history of depression, a record that would make him somebody who is likely to be a law-abiding citizen but for the offense that brings him before the court."  (Doc. No. 958 at 42.)  Even the Government commented on Petitioner's character, conceding that Petitioner "seemed to be quite remorseful about what had gone on, and [that] his family and friends seem to be incredibly genuine about their feelings about him."  (Doc. No. 958 at 38.)

Fourth, regarding Dr. Weeks's conclusion that Petitioner poses a low risk of recidivism because he had been in a long-term relationship, the fact that Petitioner dated someone for less than three years, ending in 2009, would not have altered the Court's sentencing determination. Similarly, Dr. Weeks's conclusion that Petitioner poses a lower risk of recidivism because he has not abused cocaine in nearly a decade is consistent with the Court's assessment of Petitioner at sentencing that he did not have a recent drug history and would otherwise be "a law-abiding citizen" but for his offenses of conviction.  And while Dr. Weeks's noted Petitioner's age, of which the Court was clearly aware, she wrote only that "his age has limited protective effect on his likelihood of recidivism."  (Doc. No. 1124-1 at 12.)  Neither Petitioner's prior relationship, his abstention from drugs for several years leading up to his arrest, nor his age at the time of sentencing would have caused the Court to reassess its evaluation of Petitioner's recidivism, which was based on the totality of the record and adequately reflected Petitioner's background.

In short, the Court finds no reasonable probability that it would have varied further downward to impose a sentence below 300 months even if Attorney Daniels had, in fact,

presented the evidence referenced in the Report and Petitioner's motion papers, and the cases

relied upon by Petitioner do not counsel the Court to conclude otherwise.  Petitioner cites to

several cases in which courts showed leniency when imposing sentences on child pornography

offenders.  But many of those cases involved pleas of guilty to possessing child pornography,

implicating lower guidelines ranges, and are therefore inapposite.  (Doc. No. 1114 at 50-51 & 42

n.2) (citing United States v. Smith, 275 F. App'x 184, 184 (4th Cir. 2008) (possession;

guidelines range of 78 to 97 months); United States v. D.M., 942 F. Supp. 2d 327, 343-44

(E.D.N.Y. 2013) (same); United States v. Stern, 590 F. Supp. 2d 945, 947 (N.D. Ohio 2008)

(same);  United States v. Baird, 580 F. Supp. 2d 889, 889 (D. Neb. 2008) (possession, guidelines

range of 46 to 57 months)).  Notably, in two of the cases cited by Petitioner—Smith and United

States v. Cherry, 487 F.3d 366, 372 (6th Cir. 2007)—the circuit courts upheld lenient sentences

while also suggesting that they, the circuit courts, would have imposed harsher sentences.  See

Smith, 275 F. App'x at 184 (stating, "[w]hile we cannot say we would have varied Smith's

sentence to 24 months imprisonment, we also cannot say that the district court abused its

discretion in so doing"); Cherry, 487 F.3d at 372 (stating, "we might have adhered to the

Guidelines or imposed a harsher sentence were we in the position of the sentencing court").

The Report and related information may have shed additional light on Petitioner's

circumstances for the Court's consideration at sentencing.  The relevant inquiry under the second

Strickland prong, however, is whether the Court, with that information, would have imposed a

more lenient sentence.  And here, the Court is certain that "[p]resentation of the additional

mitigating evidence" identified in Petitioner's motion papers "would not have impacted the

length of [his] sentence."  See Eckenberger v. United States, No. 1:17-cr-00118-1, 2022 WL

609208, at *4 (M.D. Pa. Mar. 1, 2022) (citing Awe v. United States of America, No. 15-cv-

08155, 2017 WL 1157865, at *4 (D.N.J. Mar. 27, 2017) (noting failure to establish <u>Strickland</u>

prejudice where there was "no reasonable likelihood that [p]etitioner would have received a

lesser sentence had counsel raised [p]etitioner's history of alcohol abuse at sentencing")).  The

Court will therefore deny Petitioner's motion.

## IV.    EVIDENTIARY HEARING

Section 2255(b) advises that a petitioner may be entitled to a hearing on his motion.  The

decision to hold a hearing is wholly within the discretion of the district court.  <u>See</u> <u>Gov't of V.I.</u>

<u>v. Forte</u>, 865 F.2d 59, 62 (3d Cir. 1989).  If "the files and records of the case conclusively show

that the prisoner is entitled to no relief," the Court need not hold a hearing.  <u>See</u> 28 U.S.C.

§ 2255(b).  In determining whether a hearing must be held regarding claims of ineffective

assistance of counsel, the Court must first "accept as true the nonfrivolous allegations in the

petition" and then "determine whether, on the existing record, those claims that are nonfrivolous

conclusively fail to show ineffective assistance of counsel."  <u>See</u> <u>United States v. Dawson</u>, 857

F.2d 923, 927-28 (3d Cir. 1988); <u>see also</u> <u>United States v. Arrington</u>, 13 F.4th 331, 334 (3d Cir.

2021) (applying standard as set forth in <u>Dawson</u>).  Here, Petitioner has conclusively failed to

establish ineffective assistance of counsel because none of the mitigating evidence identified in

his motion papers or related submissions would have led the Court to impose a lower sentence.

Accordingly, the Court finds no reason to hold an evidentiary hearing in this matter.

## V.    CERTIFICATE OF APPEALABILITY

In proceedings brought under § 2255, a petitioner cannot appeal to the circuit court unless

a certificate of appealability ("COA") has been issued.  A court may not issue a COA unless "the

applicant has made a substantial showing of the denial of a constitutional right."  <u>See</u> 28 U.S.C.

§ 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could

disagree with the district court's resolution of his constitutional claims or that jurists could

conclude the issues presented are adequate to deserve encouragement to proceed further."

Miller-El v. Cockrell, 537 U.S. 322 (2003).  "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."

Slack v. McDaniel, 529 U.S. 473, 484 (2000).  In this case, the Court concludes that jurists of reason would not find the disposition of this case debatable.  Accordingly, the Court will not issue a COA.

## VI.    CONCLUSION

The Court will grant Petitioner's "Unopposed Motion for Leave to Amend" (Doc. No. 1123), will deny Petitioner's § 2255 motion (Doc. No. 1114) without an evidentiary hearing, and will not issue a COA.  An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania
